WEST, RESPONDENT, *v.* DAVIS, AGENT, APPELLANT.

(No. 5,451.)

(Submitted April 21, 1924. Decided June 18, 1924.)

[227 Pac. 41.]

*Railroads — Crossing    Accident — Automobiles — Contributory Negligence of Driver Bars Recovery.*

Railroads—Crossing Accident—Contributory Negligence Bars Recovery.
1. A person about to cross a railroad crossing, which is itself a warning of danger, must use at least ordinary diligence and prudence and if he fails to make a vigilant use of his senses by looking and listening, and stop, if necessary, to learn if there be danger from a moving train and is injured, he is guilty of contributory negligence and not entitled to recover damages.
Same—Failure of Driver of Automobile to Look and Listen—Contributory Negligence.
2. Plaintiff, a farmer and a former railroad man of twenty-seven years' experience for two years of which he had worked in the very yards in which his automobile collided with an approaching train, who when approaching a crossing therein had an open view for a distance of about 200 feet of the track on which the train was traveling and could not have failed to observe and hear it if he had looked or listened, who could have stopped the automobile in a distance of from two to four feet at the rate he was traveling—from three to four miles an hour—and who, according to his own testimony, was

---

2. Care required of driver of automobile at railroad crossing, see notes in Ann. Cas. 1913B, 680; Ann. Cas. 1915B, 767; Ann. Cas. 1916B, 166; 21 L. R. A. (n. s.) 791; 29 L. R. A. (n. s.) 924; 46 L. R. A. (n. s.) 702.
Duty of driver of automobile as to stopping, looking and listening at railroad crossing, see note in 46 L. R. A. (n. s.) 702.

[71 Mont. 31.]

thoroughly familiar with the crossing, having crossed it "thousands of times" before, and whose eyesight and hearing were good, was guilty of contributory negligence, and therefore the trial court erred in overruling defendant company's motion for nonsuit.

Same—Testimony of Plaintiff That He Did not See Approaching Train Presents No Question for Jury, When.

3. The fact that plaintiff in a case of the character of the above testified that he did not see the train which must have been at a certain point at a given time within his plain view, where he admitted that his sight was good and that there was nothing to interfere with his vision, and when the ordinary use of his senses must necessarily have given him warning of the approaching train, did not present a question for the jury.

*Appeal from District Court, Beaverhead County; Lyman H. Bennett, Judge.*

ACTION by John A. West against James C. Davis, as Agent designated by the President under the Transportation Act of 1920. Judgment for plaintiff and defendant appeals. Reversed and remanded, with direction to enter judgment for defendant.

*Mr. George H. Smith* and *Mr. John E. Corette,* for Appellant, submitted a brief; *Mr. Corette* argued the cause orally.

*Mr. J. E. Kelly,* for Respondent, submitted a brief and argued the cause orally.

The defendant was not entitled to a nonsuit or directed verdict on the ground that plaintiff's own case shows him conclusively guilty of contributory negligence as a matter of law, under the following cases: *Walter* v. *Chicago M. & St. P. Ry. Co.,* 45 Mont. 501, 46 L. R. A. (n. s.) 702, 133 Pac. 357; *Mitchell* v. *Northern Pac. Ry. Co.,* 63 Mont. 500, 208 Pac. 903; *Sprague* v. *Northern Pac. Ry. Co.,* 40 Mont. 481, 107 Pac. 112; *Mason* v. *Northern Pac. Ry. Co.,* 45 Mont. 474, 124 Pac. 271; *Meehan* v. *Great Northern Ry. Co.,* 43 Mont. 72, 114 Pac. 781; *Everett* v. *Hines,* 64 Mont. 244, 208 Pac. 1063; *Holman* v. *Atchison etc. Ry. Co.,* 113 Kan. 710, 215 Pac. 1111; *Kirby* v. *Southern Pac. Co.,* 108 Or. 290, 216 Pac. 735.

[71 Mont. 31.]

HONORABLE JOHN C. HUNTOON, District Judge, sitting in place of MR. CHIEF JUSTICE CALLAWAY, disqualified, delivered the opinion of the court.

This is an action brought to recover damages for the destruction of an automobile owned and driven by the plaintiff, caused by a collision with a moving train in the railroad yards at Lima, Beaverhead county, Montana, at a point where the county road crosses practically at right angles the tracks of the Oregon Short Line.

The allegations of the complaint recite that on the twenty-fourth day of August, 1919, the plaintiff, with two other persons, was traveling in his automobile along and over a public highway which crosses the railroad tracks of the Oregon Short Line a short distance south of the railroad station within the town of Lima, and, having passed along the highway up to the crossing referred to, as the plaintiff had reached the crossing, and while exercising due and proper care in attempting to cross, the defendant carelessly and negligently caused one of its locomotives, with several cars attached thereto, operated and controlled by an engineer employed by the defendant, to approach the crossing at a high rate of speed, traveling rapidly over the tracks of the railroad at the point where the highway crosses the railroad track, and negligently and carelessly, while approaching the crossing, omitted to give any signal by ringing the bell or sounding the whistle, and that the plaintiff, by reason of the failure to ring the bell or sound the whistle, was unaware of the approach of the locomotive and cars, and that, as a consequence of the alleged negligence of the defendant, the locomotive with the cars attached thereto collided with and ran into the plaintiff's automobile, and broke, wrecked and destroyed the automobile owned by plaintiff, to his damage; and he alleges that by reason of the careless, reckless, and unskillful acts of the defendant he has been damaged in the value of the automobile so destroyed.

The defendant by its answer denied all the negligence alleged, and for a further defense pleaded contributory negli-

gence upon the part of the plaintiff, in that he failed to stop, look or listen, or make an effort to discover the presence or the approach of the locomotive and cars which caused the damage, and alleged that by the exercise of reasonable and proper care, he could and would have avoided any collision or accident; that the plaintiff did not stop or slacken the speed of the automobile or take any precautions whatever to ascertain whether the engine and cars were approaching on the main tracks where the collision occurred, but carelessly and negligently approached the track in the automobile in a careless, negligent, reckless and dangerous manner, and did not stop or slacken his speed and that he ran carelessly and negligently with the automobile upon the main track too late to avoid the collision and that the carelessness and contributory negligence of the plaintiff were the proximate causes thereof, and that without such negligence upon the part of the plaintiff the accident would not have happened.

The plaintiff, by way of reply, filed a general denial to the defendant's answer, and on these issues the cause was tried with a jury on the sixteenth and seventeenth days of May, 1923, and a verdict rendered by the jury in favor of the plaintiff and against the defendant. A judgment was entered thereon in accordance therewith, and a motion for a new trial made, argued and denied, and this appeal is from the judgment given and made in accordance with the verdict of the jury.

At the close of the plaintiff's case the defendant moved for a nonsuit, and, upon that being denied, presented his testimony, and at the close of the case moved the court to direct a verdict in favor of the defendant, which motion was also denied. Errors are alleged in the denial of the motion for nonsuit and in denying the motion for a directed verdict.

The facts, as claimed by the respondent and his witnesses, show that the respondent was an experienced railroad man, having had 25 years' experience in railroading as conductor and 2 years' experience in the very yards in which the collision occurred and had been in close touch with the conditions at those yards since the time he ceased to work for the railroad

company and went on a ranch; that he had crossed this particular crossing where the automobile was wrecked thousands of times and knew its dangers; that his eyesight and hearing are and were good; that he drove almost daily to town, driving the five-passenger Mitchell Six auto in which he was at the time of the accident, and in so doing crossed and recrossed this particular crossing in question repeatedly.

On the twenty-fourth day of August, 1919, plaintiff left the ranch to go to Lima, driving his car, and accompanied by his wife and a Mrs. Beardslee and in entering the town used what was known as the stockyard crossing, about half a mile below the crossing at which afterward the automobile was wrecked. There was a switch engine working at the north end of the yard at the time plaintiff first crossed the tracks coming to town, and he saw and heard the engine at that time. After getting the mail he looked to see where the engine was and listened to hear if it was moving, and could not hear nor see it. He then started toward the tracks on the road which makes what is known as the center crossing, crossing the tracks east and west at a point about 100 feet south of the south end of the depot, which is about 90 feet in length. The main track runs about 14 feet west of the depot, in a north and south direction, and respondent had to cross three or four combination tracks before reaching the main track on which the accident occurred. There were west of the depot, in addition to the main track, 5 other tracks, making in all 10 tracks to be crossed by him. There was a string of cars standing on the house track, which was the first track crossed by respondent in approaching the main line, and one of these cars projected slightly over the road about 3 feet, which caused him to turn out slightly to the left in order to pass. The railroad tracks were somewhat higher than the road on which respondent was traveling, approximately one foot. The house track was about 60 feet east of the main line where the accident occurred, with no tracks between, and after respondent had passed that track, advancing toward the main line, as soon as he had passed the edge of the freight platform which extended south of the depot a distance

of 100 feet, he could then see the main line, according to the maps used upon the trial, a distance of 206 feet to the north, that being the direction from which the engine and cars approached the crossing traveling south.

Respondent's witness Gosman testified that from a point 20 feet from the main track he could see about to the switch shanty, about 300 feet north of the depot, making approximately 500 feet, as respondent testified. Respondent was then traveling on intermediate speed, at about 3 or 4 miles an hour, and, according to his own testimony, could stop the machine in a distance of from 2 to 4 feet. It was, according to respondent's own testimony, a clear day, and, while near the sunset hour, he does not pretend but that he could see as well as at any other time in the day. The top of the automobile was up, but the side curtains were not on, and the respondent's view of the main line track was clear and unobstructed for the distance mentioned, except that there was a telegraph pole, which respondent admits did not obstruct his view, at or near the corner of the depot. He says that when he reached the point marked A on the map used on the trial, which he testified to be about 45 feet from the crossing, he looked up the main line and saw nothing approaching from the north, and heard nothing; he proceeded to the main line crossing at the rate of 3 to 4 miles an hour, without stopping; and he says: "Just as I was going on the main line I heard a noise like the noise of a train, and *I looked up,* and there it was, right on us. In going across [from the 45-foot point to the main line] I was also looking to see where I was going. When I saw the train it was coming by the depot with a roar, and I saw that I could not get across, and so I swung my car around, and it hit me." Respondent also says that when he looked up at the point A, from which he could see the track clear for a distance of 150 or 200 feet north of the crossing, he was watching also the other tracks to the west, because they all had cars on them, and he did not know but the switch engine might be coming up on some other track than the main line. There was but one engine in the

yards, this switch engine in question, which he had observed working when he crossed the stockyard crossing, the engine then being a half mile below where the collision occurred, and about 300 or 400 feet from the stockyard crossing. Respondent testified that the fact that there was quite a number of cars on the other tracks to the west of the main line interfered somewhat with his observations, as he had to watch all the tracks to see if any cars were moving.

The train that struck the automobile consisted of three cars and the engine, a stock car being on the south end of the train, an oil-tank next, a caboose next, and last, to the north, the engine pushing these cars from the rear. Respondent testified that at the time of the collision the train was moving 25 to 30 miles an hour, but admitted that on the first trial of the action he had estimated the speed at 18 to 20 miles an hour. Respondent's witness Merrill, who saw the collision, estimates it at 20 miles an hour, and a careful computation shows that, in order to bring the collision about, the train must have been going at the rate of 20 miles an hour, as the time consumed by the automobile in traveling from the point A to the main line track, and by the train in traveling 206 feet at 20 miles an hour to the point of collision, is practically the same—7 seconds and a small fraction; that from the point A respondent had a clear and uninterrupted view of the main line for that distance, and the front brakeman on the train first saw respondent when he came around the corner of the freight platform, so that the train must have been at the point 206 feet from the point of collision at the very moment the automobile passed the point A. As the respondent advanced from the point A toward the main line his line of sight to the north on the track increased, and at 20 feet distant from the main track he could see without hindrance about 500 feet north on the main line.

There were no yard rules shown by the respondent to be in effect in the yards governing the speed at which the switching should be done, and the evidence offered by the appellant shows that no such rules existed at the time of the accident.

The respondent also testified that when he first saw the cars approaching they were about 100 feet distant, and his car was just about going on to the track—"just about on to it." In another part of his testimony he says he kept his car going from the point A to the point of collision, "and when I got in the middle of the track I looked and saw the train coming about at the corner of the depot, about 100 feet away." If that is true, and the respondent had kept going, he would easily have cleared the track before the train arrived at the point of collision. He says that he did not know then (at the time he saw the train) whether he had time to go across the track or not, but he did not think he had; that he did not have time to reverse and back off, and he had just time to turn the front end and stop the car, which he did by seizing the emergency brake and throwing out the clutch. The collision pushed the car south on the track a distance of 172 feet practically demolishing it. He also testified that from the time he reached the point A until he reached the main line he was looking and listening all the time, and heard no bell and saw nothing until, as he testified, he looked up when on the track and saw the train 100 feet distant from the point of collision. He testified that when he reached the point A he looked up and did not see any train and that if there had been a train on the main line approaching from the north, and he had looked when at the point A, or from any other point between the point A and the main line he could have seen the train. Manifestly the train must have been where he could have seen it either when he was at the point A or before he got to the tracks, if he had looked, as otherwise no collision could have occurred even if the train were moving at the extreme speed estimated by him as 30 miles an hour.

A train, as shown by the witnesses for the respondent and by computation, moving 30 miles an hour, covers 44 feet per second, and would take $2\frac{1}{4}$ seconds to move the 100 feet from where respondent says he first saw it to the point of collision. At 20 miles an hour the train would move $29\frac{1}{3}$ feet per second and would take 3 9/22 seconds to cover the distance. Respond-

ent's witnesses and computation show that at the rate of 4 miles an hour the automobile traveled 5.87 feet per second, and in $2\frac{1}{4}$ seconds would necessarily travel in excess of 13 feet, and in 3 9/22 seconds would travel 20 feet; so that if the respondent was on the track at the time when he saw the train, as he testified, and the train was 100 feet away, manifestly all he had to do to avoid the collision was to continue on at the same speed, and there would have been no collision, no matter whether the train was making 20 or 30 miles an hour.

The witnesses for the defendant testified that the whistle of the switch engine was blown at a point 60 or 70 rods from the crossing, and the bell on the engine rung continuously from the time it left the north end of the yards, 2,000 feet from the depot, to the time of the collision. The respondent, however, testified that he heard no bell and heard no whistle at any time and saw no train until it was within 100 feet of him. In this connection it is significant that the two ladies who accompanied respondent in the automobile were not sworn as witnesses in his behalf, and no explanation given for their absence.

The fireman on the engine testified that when he first saw respondent's car it was about 10 feet from the track, and that respondent stopped 5 feet from the track, and then lunged ahead and turned right toward the train, the train being, when he first saw the auto, over 3 car-lengths away, a distance of approximately 125 feet, as shown by other testimony.

The witness Youngkin a contractor, was going from the east to the west side of the town, and met respondent when witness was on the south side of the roadway and about the first track east of the house track, a distance of approximately 90 feet east of the point of collision; witness heard the train coming, and heard the bell ringing, and held up his hand to warn respondent but the latter gave no heed to the signal and continued on westerly.

The brakeman standing at the right side of the front car on the riding step testified he saw the respondent when the auto came past the corner of the freight platform, and until he came to within 4 or 5 feet of the crossing, where respondent

stopped; witness gave the "easy" signal as soon as he observed the auto, and when he saw the machine stop allowed the engineer to come on; that when the train got about 1 or 1½ car-lengths from the crossing the auto started up, got on the track, and turned toward the train and witness immediately gave the "washout" signal to stop as soon as possible; that the auto, when hit, was probably 6 or 7 feet off the crossing, coming toward the train.

This is substantially the testimony given by the witnesses for both respondent and appellant on the trial.

Counsel for appellant have gathered together a great many [1, 2] cases from different states, all bearing upon the contention that the respondent was guilty of contributory negligence in this action. We do not, however, have to go outside the decisions of this court for cases which should be decisive of the case at bar.

The case of *Hunter* v. *Montana Central Ry. Co.*, as far back as 22 Mont. 525, 57 Pac. 140, decided that a person approaching a railway crossing must use at least ordinary diligence and prudence, and, if he fails to make a vigilant use of his senses, that is, to look, listen, or stop, if necessary, to learn if there is danger, and by reason of this failure to exercise this precaution he is injured, then he contributes directly to such injury and cannot be heard to say that the railroad company did him the injury and should compensate him for its wrong.

In the case of *Meehan* v. *Great Northern Ry. Co.*, 43 Mont. 72, 114 Pac. 871, this court said: "Let us remember that the railroad tracks were in themselves a warning of danger," and quoted approvingly from the case of *Hunter* v. *Montana Central Ry. Co.*, just referred to, and made use of the following language: "We are impelled to the conclusion that Meehan neither looked, listened nor took any precautions for his own safety. Had he used his senses, he could not have failed both to hear and to see the approaching train. Having omitted to use them, he was guilty of contributory negligence, and the district court properly so held."

In *George* v. *Northern Pacific Ry. Co.*, 59 Mont. 162, 196 Pac. 869, this court made use of the following language: "Every person is bound to an absolute duty to exercise his intelligence to discover and avoid dangers that may threaten him. When, therefore, a plaintiff asserts the right of recovery on the ground of culpable negligence of the defendant, he is bound to show that he exercised his intelligence to discover and avoid the danger, which he alleges was brought about by the negligence of the defendant. \* \* \* There is foundation in the evidence for but one conclusion, namely, that, if Wise had used the most ordinary precaution, his automobile would not have been injured. There was no emergency calling for haste. \* \* \* His range of vision toward the west was rapidly increasing. He was familiar with the crossing. If he had waited for a few moments, he would have had a clear·view for a long distance toward the west; or, even after he had started, if he had kept watch toward the west while traveling the distance of 30 feet before he reached track 2, he could have stopped. \* \* \* Interpreting his testimony in the light of these circumstances, one is forced to the conclusion that he failed to exercise the care which an ordinarily prudent man would have exercised under like circumstances. The nonsuit was therefore properly granted."

The case of *Normandin* v. *Payne*, 65 Mont. 543, 212 Pac. 285, uses this language: "A person approaching a railroad crossing is required to take all reasonable precaution to assure himself by actual observation that there is no danger from an approaching train. The failure of the persons in charge of the train to keep a lookout and to give warning signals of its approach to the crossing does not relieve the traveler from the necessity of making a vigilant use of his senses to ascertain whether it is safe to proceed. \* \* \* It is not always sufficient if he does look and listen. The obligation resting upon him is to exercise care to make the act of looking and listening reasonably effective. \* \* \* If he goes upon the crossing without taking this precaution, he is guilty of contributory negligence."

The case of *Keith* v. *Great Northern Ry. Co.*, 60 Mont. 505, 199 Pac. 718, resembles the case at bar very closely, except that the plaintiff there saw the train at about 26 feet from the place where his automobile was struck, his view of the track being obstructed by buildings on each side until he reached that point.   When he saw the train coming he shut off the power in the automobile and thought it would easily stop before he got in front of the train; but it did not do so, and the automobile was struck and wrecked.   The plaintiff testified that he could stop the automobile within a distance of 7 feet if he had attempted to do so.   The court there held that the plaintiff was guilty of contributory negligence in that he did not use reasonable care to avoid the collision.

In the case of *Roberts* v. *Chicago, M. & St. P. Ry. Co.*, 67 Mont. 472, 216 Pac. 332, the court said: "The rules for determining the liability for injuries resulting from collisions on railroad crossings have been definitely established in this jurisdiction," and proceeds to set forth those rules to be that the presence of a railroad track is of itself a warning of danger; a person approaching a railroad crossing is required to take all reasonable precautions to assure himself by actual observation that there is no danger from an approaching train; the failure of the persons in charge of the train to give warning signals of its approach to the crossing does not relieve the traveler of the necessity of making a vigilant use of his senses to ascertain whether it is safe to proceed; the traveler must use ordinary care to make his looking and listening reasonably effective; and that, whenever it appears that there is a zone of safety within which a traveler upon the highway may, by looking and listening, and stopping if need be, to ascertain the presence of an on-coming train, it is his duty to make his observation within such zone; if he proceeds from the place of safety regardless of an approaching train of which he has knowledge, or if he leaves the place of safety without having made a vigilant use of his senses to discover a danger which is present and could have been seen from such place, then it will be held to be his negligence which is the proximate cause of the injury resulting from

a collision, regardless of circumstances tending to show negligence on the part of the railroad operators. When a train is at a point which is within the traveler's vision while he is in a place of safety, he will be deemed either to have seen it and proceeded regardless of the danger, or to have failed to make a vigilant use of his senses. In such a situation the traveler is the author of the misfortune which befalls him, if he meets with injury.

Applying these principles to the case at bar, the conclusion cannot be avoided that the plaintiff in this action was himself guilty of such contributory negligence as constituted the proximate cause of the collision between his automobile and the train. It is apparent, no matter what the plaintiff himself testified, that the train, at the time when the plaintiff was in place of perfect safety, was at a point where the plaintiff could not have failed to observe and hear it if he had looked or [3] listened. We cannot subscribe to the proposition, because a man testifies that he did look and did not see an object which manifestly must have been at a certain point at a given time within his plain view, where he admits that his sight is good and nothing to interfere with his vision, that thereby any question is presented for the jury when the ordinary use of his senses must necessarily have given him warning of the approach of the on-coming train. These facts, in our opinion, were demonstrated beyond any question upon the trial of this case by the testimony offered by the respondent himself and his witnesses; and we think, for the reasons above stated, and in view of the previous decisions of this court, that the trial court erred in refusing to grant the nonsuit requested by the defendant at the close of plaintiff's case, and also erred in refusing to direct a verdict for defendant, inasmuch as the defendant's case in nowise aided the case of the plaintiff.

There are eight errors alleged by the appellant, but the only errors we deem of importance are the specifications that the court erred in overruling the motion for a nonsuit, and in refusing to direct a verdict for defendant.

For the reasons above stated, the judgment is reversed and the cause remanded, with directions to the district court to enter judgment for the defendant.

*Reversed.*

ASSOCIATE JUSTICES COOPER, HOLLOWAY and STARK and HONORABLE WILLIAM L. FORD, District Judge, sitting in place of MR. JUSTICE GALEN, disqualified, concur.